**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

THE ESTATE OF SIERRA SIMONE SUNSHINE CLAYBORN, by and through GREGORY CLAYBORN, its successor in interest; GREGORY CLAYBORN, individually and as survivor and heir of Sierra Simone Sunshine Clayborn; and KIMBERLY CLAYBORN, individually and as survivor and heir of Sierra Simone Sunshine Clayborn; on behalf of themselves and all others similarly situated,

Plaintiffs,

- against -

FEDERAL INSURANCE COMPANY, EDWARD JOSEPH SNOWDEN, LAURA POITRAS, and PRAXIS FILMS, INC.,

Defendants.

Civil Action No. ____________

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs the Estate of Sierra Simone Sunshine Clayborn, by Gregory Clayborn as its successor in interest, Gregory Clayborn, and Kimberly Clayborn, on behalf of themselves and all others similarly situated, by their attorneys, for their Class Action Complaint against Defendants Federal Insurance Company, Edward Joseph Snowden, Laura Poitras, and Praxis Films, Inc., allege as follows:

## NATURE OF THE ACTION

1. This is a civil action under the Anti-Terrorism Act, 18 U.S.C. § 2331 et seq. (the "ATA"), as amended by the Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852 (2016) ("JASTA"), 18 U.S.C. § 2333(a) and (d), for the murder of Sierra Simone Sunshine Clayborn, a United States national, in the terrorist attack at the Inland Regional Center in San Bernardino, California, on December 2, 2015.

2. Plaintiffs bring this action on their own behalf and, under Fed. R. Civ. P. 23, on behalf of all persons injured by the San Bernardino attack and all persons injured by acts of international terrorism enabled by the disclosure of the stolen classified documents described below. Defendants' conduct was not a single act but a pattern of repeated, continuous assistance to a series of terrorist activities, of the kind the Supreme Court recognized in *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023), as "pervasive, systemic, and culpable assistance to a series of terrorist activities that could be described as aiding and abetting each terrorist act," and it injured Plaintiffs and the members of the Classes in the same way.

3. Plaintiffs allege that Defendant Snowden stole hundreds of Top Secret and Secret documents of the United States describing the means and methods by which the United States detects, tracks, and prevents terrorist attacks, and, with Defendants Laura Poitras and Praxis Films, Inc. and others, continuously disclosed and disseminated them to foreign terrorist organizations and state sponsors of terrorism, including through the preparation, production, release, exhibition, distribution, and promotion of the film *Citizenfour* (2014); and that Defendant Federal Insurance Company, with knowledge of the theft and of the disclosures, underwrote, insured, and kept in force for the Policy Period the media liability coverage for that dissemination, and thereby knowingly provided substantial assistance to, and conspired with, the persons who committed the attack and the foreign terrorist organization that authorized it. Plaintiffs' claims against Federal under JASTA are not claims for insurance benefits under the Policy. They are claims against Federal for its own conduct: the decision to underwrite, insure, and continue to insure the dissemination of stolen national defense information, which was not a routine insurance transaction but an unusual business practice undertaken with knowledge of what was being insured and for whom.

4. The disclosures were not journalism. Their purpose, and their effect, was to influence the public and the foreign policy of the United States by coercion, including United States policy toward Israel, by exposing and degrading the intelligence sources and methods on which that policy depends, while invoking the First Amendment as a shield for the theft and communication of national defense information that no journalist may lawfully possess.

5. Plaintiffs file this Complaint to preserve their claims and will amend it as of right under Fed. R. Civ. P. 15(a)(1) before service. Every claim asserted in the amended pleading will arise out of the conduct, transactions, and occurrences set out in this Complaint: the theft of the documents; their disclosure and dissemination from June 2013 through December 2, 2015 and thereafter, in every medium and by every person or entity involved; the underwriting, issuance, maintenance, and administration of the Policy and any related, renewal, or other insurance; the defense of claims under the Policy; and the San Bernardino attack and Plaintiffs' injuries. Plaintiffs reserve the right to add parties and claims.

**JURISDICTION AND VENUE**

6. This Court has subject-matter jurisdiction under 18 U.S.C. § 2338, which vests the district courts of the United States with exclusive jurisdiction over civil actions under the ATA, and under 28 U.S.C. § 1331.

7. Venue is proper in this District under 18 U.S.C. § 2334(a), because Defendant Praxis Films, Inc. resides in this District, Defendant Poitras maintains a residence in this District, and Defendant Federal Insurance Company has an agent in this District, and under 28 U.S.C. § 1391(b) and (c).

8. This Court has personal jurisdiction over Defendant Federal Insurance Company under 18 U.S.C. § 2334(a) and N.Y. C.P.L.R. §§ 301 and 302, because it is licensed to transact

insurance business in New York, transacts business in New York, and issued and delivered the Policy in New York; over Defendant Praxis Films, Inc., a New York corporation, and Defendant Poitras, who maintains a residence in New York and transacts business here through Praxis Films, Inc., under N.Y. C.P.L.R. §§ 301 and 302; and over Defendant Snowden under 18 U.S.C. § 2334(a), N.Y. C.P.L.R. § 302, and Fed. R. Civ. P. 4(k)(2), because he is a United States citizen residing outside the United States who is not subject to the jurisdiction of the courts of general jurisdiction of any State.

9. This action is timely under 18 U.S.C. § 2335. Plaintiffs' claims under 18 U.S.C. § 2333(d)(2) accrued on September 28, 2016, when JASTA created them, and this action is commenced within ten years of that date. *Moses v. BNP Paribas, S.A.*, 802 F. Supp. 3d 567 (S.D.N.Y. 2025). As to Defendant Snowden, the time of his absence from the United States since May 2013 is excluded under 18 U.S.C. § 2335(b).

**PARTIES**

10. Sierra Simone Sunshine Clayborn ("Sierra") was a national of the United States. She was 27 years old when she was murdered on December 2, 2015.

11. On information and belief, a proceeding concerning Sierra's estate was commenced in the Superior Court of California, San Bernardino County. Plaintiffs are not presently aware of any order in that proceeding appointing a personal representative of the estate. To the extent no personal representative has been appointed, the claims of her estate under 18 U.S.C. § 2333(a), including for her conscious pain and suffering, are asserted by Plaintiff Gregory Clayborn as her successor in interest under applicable law, including Cal. Code Civ. Proc. §§ 377.30-377.32. If a personal representative has been or is appointed, Plaintiffs will substitute or join that representative under Fed. R. Civ. P. 17(a)(3), and the substitution will relate back to the filing of this Complaint.

12. Plaintiff Gregory Clayborn is Sierra's father. He is a national of the United States and resides in Los Angeles, California He sues individually, as a survivor and heir of Sierra, and as successor in interest to her estate, under 18 U.S.C. § 2333(a).

13. Plaintiff Kimberly Clayborn is Sierra's step-mother and raised her from age 3. She is a national of the United States and resides in Los Angeles. She sues individually and as a survivor and heir of Sierra under 18 U.S.C. § 2333(a).

14. Defendant Federal Insurance Company ("Federal") is a stock insurance company incorporated under the laws of Indiana with its principal place of business in Whitehouse Station, New Jersey. It is a member of the Chubb Group of Insurance Companies and is licensed to transact insurance business in New York. On information and belief, in or about 2013, through a New York broker, Federal issued to Praxis Films, Inc., a New York corporation, a media liability policy on Federal's MediaGuard(SM) by Chubb policy form (the "Policy"), providing Producers Liability Coverage and Internet Liability Coverage for the Production entitled *Citizenfour* for a policy period that included December 2, 2015. Plaintiffs do not possess the Policy. The allegations herein concerning its terms are made on information and belief and on the basis of the MediaGuard(SM) by Chubb policy form and endorsements that Federal issued for productions of this kind in 2013, which Plaintiffs believe were used for the Policy.

15. Defendant Edward Joseph Snowden is a United States citizen who, on information and belief, resides in or near Moscow, Russia, and has resided outside the United States since May 2013. He is a former contractor for the National Security Agency and a former employee and contractor of the Central Intelligence Agency. On June 14, 2013, the United States charged him by criminal complaint in the Eastern District of Virginia with theft of government property, 18 U.S.C. § 641; unauthorized communication of national defense information, 18 U.S.C. § 793(d);

and willful communication of classified communications intelligence to an unauthorized person, 18 U.S.C. § 798(a)(3). He is the principal participant in *Citizenfour* and, on information and belief, as a cast member and show participant of the Production, an Insured Person under the Policy.

16. Defendant Praxis Films, Inc. ("Praxis") is a New York corporation with its principal place of business in New York, New York. It produced *Citizenfour* and, on information and belief, is the Parent Organization and named Insured Organization under the Policy.

17. Defendant Laura Poitras is a United States citizen who, on information and belief, maintains a residence in New York, New York, and has resided in Berlin, Germany. She is the president and a shareholder of Praxis and directed, produced, and financed *Citizenfour* through it. On information and belief, she is an Insured Person under the Policy. On or about May 2013 she received from the recipient who had received package delivered to Brooklyn, New York from Defendant Snowden, as described in the book SNOWDEN'S BOX a trove of classified documents, and as described in the book DARK MIRROR, she thereafter maintained, used, and disseminated them, including through *Citizenfour* and through First Look Media, Inc. and The Intercept, which she co-founded and which maintained an archive of the documents until 2019. On December 21, 2020, she stated in writing in an Op-Ed published in the *New York Times:* "I am guilty of violating the Espionage Act, Title 18, U.S. Code Sections 793 and 798," and admitted that she "reported on and published highly classified documents from the National Security Agency provided by" Defendant Snowden.

## FACTUAL ALLEGATIONS

18. In 2013, while working as a contractor at the National Security Agency, Defendant Snowden stole hundreds of Top Secret and Secret documents of the United States. Together, those

documents set out the means and methods by which the United States detects, tracks, and prevents terrorist attacks.

19. On information and belief, the theft was a steal-to-order scheme. Beginning no later than January 2013, Defendants Snowden and Poitras, in encrypted communications, agreed on certain of the documents or categories of documents Defendant Snowden would take and the use to which they would be put. Among the documents taken to order was the April 25, 2013 order of the Foreign Intelligence Surveillance Court directing Verizon Business Network Services to produce telephony metadata, a document selected because its disclosure would supply a customer of Verizon Business Network Services with standing to challenge the program in federal court. That order was published on June 5, 2013. Six days later, on June 11, 2013, the American Civil Liberties Union, a Verizon Business Network Services customer, filed *ACLU v. Clapper*, No. 13-cv-3994, in this Court, pleading the published order as the basis of its standing. On information and belief, Defendants Snowden and Poitras selected and delivered that document, and others, to and for the use of counsel at the ACLU in New York for that purpose. Ben Wizner of the ACLU in New York appears in *Citizenfour* as Defendant Snowden's counsel.

20. Defendants Poitras and Praxis were not passive recipients of information that a source had obtained unlawfully. The First Amendment protection recognized in *Bartnicki v. Vopper*, 532 U.S. 514 (2001), extends only to a publisher who "lawfully obtain[ed]" the information and "played no part" in its unlawful acquisition, and it does not extend to one who is bound by a duty not to disclose. *Boehner v. McDermott*, 484 F.3d 573 (D.C. Cir. 2007) (en banc). Defendant Snowden was bound by secrecy agreements with the United States and had no right to disclose. Defendant Poitras, and Praxis through her, participated in the acquisition itself: she agreed with Defendant Snowden before the theft on what would be taken and how it would be

used, instructed him on the secure channels through which it would be delivered, received it from him in person, and then directed its dissemination. That is culpable participation in the theft and communication of national defense information under 18 U.S.C. §§ 793 and 798, not the receipt or solicitation of information by a journalist, and it is the participation to which Defendant Poitras has confessed.

21. Beginning in June 2013 and continuing through December 2, 2015 and thereafter, Defendants Snowden, Poitras, and Praxis, acting with others, disclosed and disseminated those documents and their contents, together with instruction in the means of evading United States intelligence collection, to a worldwide audience through newspapers, websites, social media, public appearances, and the film *Citizenfour* and its Internet Sites, including to foreign terrorist organizations designated under Section 219 of the Immigration and Nationality Act, 8 U.S.C. § 1189, among them al-Qaeda and its branches and the Islamic State of Iraq and al-Sham ("ISIS"), and to state sponsors of terrorism, including the Islamic Republic of Iran. Members and supporters of those organizations studied the disclosures and Defendant Snowden's instruction and adopted new means of concealing their communications and activities from United States detection.

22. Defendants Praxis and Poitras, with others, prepared, produced, financed, released, exhibited, distributed, broadcast, and promoted *Citizenfour*, which premiered in October 2014, was released in theaters in the United States and abroad, was broadcast on television in February 2015, and received the Academy Award for Best Documentary Feature on February 22, 2015. The film publicized the dissemination of the stolen documents and their contents and Defendant Snowden's instruction in evading detection. Defendants Praxis and Poitras applied for and obtained the Policy from Federal for that purpose.

23. On information and belief, Federal underwrote the Production. Federal's application form for producers liability coverage required the applicant to furnish the script or a copy of the Production, its advertising, and a title search, and required compliance with Federal's clearance procedures. On information and belief, Federal knew from the application and its clearance review, before it issued the Policy, that the Production would disseminate classified documents stolen by Defendant Snowden, against whom a criminal complaint charging theft of government property and unlawful communication of national defense and communications intelligence information had been filed and made public on June 21, 2013.

24. Federal knew that foreign terrorist organizations and state sponsors of terrorism commit acts of international terrorism against United States nationals and use disclosures of United States intelligence sources and methods to evade detection. Federal itself sued al-Qaeda and its supporters in this Court under the Anti-Terrorism Act for the attacks of September 11, 2001. *Federal Ins. Co. v. al Qaida*, No. 03 CV 6978 (S.D.N.Y.), in *In re Terrorist Attacks on September 11, 2001*, 03 MDL 1570.

25. On information and belief, with that knowledge, Federal issued the Policy, extended coverage under it to Defendants Praxis, Poitras, and Snowden, and kept the Policy in force through the Policy Period and through December 2, 2015, while the stolen documents were disseminated through the Production, its Internet Sites, and its social media platforms. Federal's coverage was a condition of the Production's financing, distribution, exhibition, and broadcast, and without it the dissemination alleged herein would not have occurred.

26. On information and belief, the stolen documents publicized hrough *Citizenfour* and disseminated by Poitras, including on its Internet Sites ,were Matter within the meaning of the Policy form, and their dissemination was a Production Activity and an Internet Activity that

Federal insured. The Matter was not general information. It was the operational detail of United States signals intelligence: which carriers and providers were compelled to produce records; which programs collected telephony metadata and internet content, by what authority, and in what form; how devices, accounts, and encrypted communications were selected, targeted, and exploited; and how the United States tracked the communications of persons abroad and their contacts in the United States. To a person planning an attack, it was perfect information: it identified each channel the United States was watching and taught how to avoid it.

27. On information and belief, beginning no later than February 2015, Federal, through the Chubb Group of Insurance Companies, defended *Edwards v. Snowden*, No. 2:14-cv-02631 (D. Kan.), on behalf of its Insureds under the Policy. The pleadings served on Federal's Insureds in that action, and provided to Federal in the course of the defense, alleged that *Citizenfour* disseminated classified information stolen by Defendant Snowden; that the disclosures had been followed within months by new encryption tools issued by al-Qaeda, its affiliates, and ISIS; that the United States and its allies were as a result finding it "much more difficult to intercept" the communications of those organizations; and that the film "creates a substantial and obvious risk of serious bodily injury" by "pointing the way for others to commit violent acts." Federal thus had, no later than February 2015, specific information from which it could reasonably foresee that the continued dissemination of the stolen documents under its Policy was enabling terrorists in the United States to conceal their plans from detection.

28. On information and belief, with that information, Federal did not cancel or rescind the Policy, did not reserve its rights, did not condition its continued coverage on the removal of classified Matter from the Production, and did not report the Matter to any authority. It continued to insure, defend, and thereby underwrite the ongoing dissemination of the stolen documents

through the Production, its theatrical, television, and home-video distribution, and its Internet Sites through December 2, 2015. Federal's continued coverage and defense were substantial assistance: they were the financial condition that the Production's distributors, broadcasters, and exhibitors required, and on which the dissemination of the Matter to the public, including to the perpetrators of the San Bernardino attack, depended.

29. On information and belief, Federal acted knowingly. It knew from the application, from its clearance review, from the public criminal complaint against Defendant Snowden, from the *Edwards* pleadings, and from its own litigation against al-Qaeda in this Court that the Matter it insured was stolen national defense information, that foreign terrorist organizations were using it to evade detection, and that an attack in the United States by persons so assisted was foreseeable. Federal was at least generally aware of its role in that unlawful activity at the time it provided the assistance, and it provided the assistance for its own commercial benefit.

30. Federal's conduct was not the provision of a routine service at arm's length. Media liability underwriting is a specialized practice in which the insurer, before binding coverage, requires clearance of the content to be published: a title search, releases, a clearance opinion from counsel that the producer holds clear title to the material and that its use is lawful, and a review of the script or the production itself. On information and belief, no clearance opinion could truthfully have been given for *Citizenfour*, because its central content was property stolen from the United States by a person under criminal charge for the theft, to which no producer could hold title and whose publication no counsel could certify as lawful. Federal issued and maintained the coverage anyway. On information and belief, it did so without excluding the classified Matter, without a reservation of rights, without requiring redaction, and at a premium that priced the risk as ordinary media content, and it continued to do so after the criminal complaint against Defendant Snowden,

after the film's release, and after the *Edwards* pleadings told it what the Matter was doing. An insurer that knowingly underwrites the dissemination of stolen intelligence sources and methods to the public, including to foreign terrorist organizations, is not providing a generally available service in the ordinary way; it is providing a specialized service in an unusual way, for a purpose and a customer it understood, and it is providing dangerous wares. Federal's participation was therefore direct, active, and substantial.

31. Farook and Malik used the information. On information and belief, before the attack they adopted the concealment practices that the stolen documents and Defendant Snowden's instruction taught: they communicated about the attack through channels the disclosures identified as unmonitored, avoided those the disclosures identified as collected, and, in the days before December 2, 2015, destroyed the hard drive of their computer and crushed their two mobile telephones so that the devices and their contents could not be recovered. Investigators recovered the crushed telephones from a trash can near the couple's home and never recovered the hard drive. Those steps, and the two years of planning that preceded the attack without detection, were the product of the sources-and-methods information that Defendants disclosed and Federal insured.

32. On December 2, 2015, Syed Rizwan Farook and Tashfeen Malik attacked a gathering at the Inland Regional Center in San Bernardino, California, killing fourteen people and wounding more than twenty others. Sierra was among those murdered.

33. The attack was an act of international terrorism within the meaning of 18 U.S.C. § 2331(1). It was committed, planned, or authorized by al-Qaeda, an organization designated as a foreign terrorist organization under Section 219 of the Immigration and Nationality Act on October 8, 1999, and by its branches al-Qaeda in the Arabian Peninsula ("AQAP"), so designated on January 19, 2010, and al-Shabaab, so designated on March 18, 2008.

34. On December 1, 2015, al-Qaeda's leader, Ayman al-Zawahiri, authorized the attack. In a video released that day by al-Qaeda's media arm, as-Sahab, entitled "Support Your Prophet," al-Zawahiri praised AQAP's January 2015 attacks in Paris and directed Muslims to "move the battle to the enemy's own home, especially Europe and America," stating that Americans "must be killed, just like they kill." One month earlier, on or about November 1, 2015, al-Zawahiri had directed "lone wolf" attacks against "the West and specifically America in its own home," citing the 2013 Boston Marathon bombing as the model. The attack in San Bernardino followed the December 1 authorization by one day.

35. Farook was a follower of al-Qaeda. According to the criminal complaint filed by the United States on December 17, 2015 against Enrique Marquez, Jr., Farook studied AQAP's *Inspire* magazine and the lectures of AQAP's Anwar al-Awlaki and videos produced by al-Shabaab; in August 2011 he told Marquez of his interest in joining AQAP in Yemen; in 2011 and 2012 he and Marquez planned attacks in Riverside County, California; and the two rifles Marquez bought for Farook in that period were used in the San Bernardino attack. Farook and Malik had contacts with persons associated with al-Qaeda's affiliates al-Shabaab and Jabhat al-Nusra.

36. The attackers planned and carried out the attack undetected by the means and methods that Defendants disclosed and disseminated.

37. As a direct and proximate result of Defendants' conduct, Sierra suffered severe bodily injury, conscious pain and suffering, and death, her estate has suffered damages including her conscious pain and suffering, and Plaintiffs Gregory and Kimberly Clayborn have suffered the loss of their daughter, the loss of her society, companionship, comfort, and support, and severe and continuing mental anguish and emotional distress.

## CLASS ACTION ALLEGATIONS

38. Plaintiffs bring this action under Fed. R. Civ. P. 23(a), (b)(1), and (b)(3) on behalf of themselves and the following classes (the "Classes"):

(a) **The San Bernardino Class:** all nationals of the United States who were injured in their person, property, or business by reason of the San Bernardino attack of December 2, 2015, and the estates, survivors, and heirs of those killed in it; and

(b) **The Disclosure Class:** all nationals of the United States who were injured in their person, property, or business by reason of an act of international terrorism occurring on or after June 5, 2013 that was committed, planned, or authorized by a foreign terrorist organization and that was planned, prepared, or carried out with the use of the stolen classified documents, or the information, instruction, and techniques disclosed with them, and the estates, survivors, and heirs of those killed.

39. Excluded from the Classes are Defendants, their officers, directors, employees, and affiliates, and the judicial officers to whom this action is assigned.

40. **Numerosity.** The San Bernardino attack killed fourteen people and wounded more than twenty; with their estates, survivors, and heirs, the San Bernardino Class comprises well over one hundred persons. The Disclosure Class comprises the victims of multiple attacks in the United States and abroad from 2013 to the present. Joinder of all members is impracticable.

41. **Commonality.** Questions of law and fact common to the Classes include: whether Defendant Snowden stole the classified documents and, with Defendants Poitras and Praxis, disclosed and disseminated them; whether the disclosures were acts of international terrorism; whether Federal knew, when it issued and maintained the Policy, that the Matter it insured was stolen national defense information used by foreign terrorist organizations to evade detection;

whether Federal's underwriting, coverage, and defense constituted knowing and substantial assistance; whether Defendants' conduct was a continuous course of assistance to a series of terrorist activities; and the measure of damages under 18 U.S.C. § 2333(a).

42. **Typicality.** Plaintiffs' claims are typical of the Classes' claims. They arise from the same course of conduct by Defendants and rest on the same legal theories.

43. **Adequacy.** Plaintiffs will fairly and adequately protect the interests of the Classes. They have no interests antagonistic to the Classes, and they have retained counsel with more than twenty years' experience in complex litigation in this Court, including the litigation of class action claims.

44. **Rule 23(b)(1).** Prosecution of separate actions by individual Class members would create a risk of inconsistent adjudications that would establish incompatible standards of conduct for Defendants, and adjudications with respect to individual members would, as a practical matter, be dispositive of the interests of other members.

45. **Rule 23(b)(3).** The common questions predominate over questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Defendants' liability turns on their own conduct, which was the same as to every member; individual issues are limited to damages. Class members have little interest in individually controlling separate actions, no other litigation concerning these claims against these Defendants is pending, this District is the appropriate forum, and the action presents no unusual difficulties of management.

## FIRST CLAIM FOR RELIEF

### Aiding and Abetting an Act of International Terrorism, 18 U.S.C. § 2333(d)(2)

46. Plaintiffs repeat the foregoing allegations.

47. The San Bernardino attack was an act of international terrorism committed, planned, or authorized by an organization designated as a foreign terrorist organization under Section 219 of the Immigration and Nationality Act as of the date of the attack.

48. Each Defendant consciously, voluntarily, and culpably participated in the wrongdoing. Defendant Snowden stole the documents and chose to disclose them; Defendants Poitras and Praxis planned the theft with him, took delivery of the documents, and disseminated them for years; and Federal, with specific knowledge of what the Matter was and of its use by foreign terrorist organizations, chose to underwrite it and to keep insuring and defending its dissemination. None acted at arm's length or through a generally available service provided in the ordinary way. Each provided intentional aid that substantially furthered the acts of international terrorism that injured Plaintiffs and the Classes.

49. Defendants aided and abetted the attack, and the other acts of international terrorism that injured the Disclosure Class, by knowingly providing substantial assistance to the persons who committed them and to the organizations that committed, planned, or authorized them. Their assistance was continuous and systemic from June 2013 through December 2, 2015 and after, and it aided each act in the series.

50. Defendants are liable to Plaintiffs and the members of the Classes under 18 U.S.C. § 2333(a) and (d)(2).

## SECOND CLAIM FOR RELIEF

### Conspiracy to Commit an Act of International Terrorism, 18 U.S.C. § 2333(d)(2)

51. Plaintiffs repeat the foregoing allegations.

52. Defendants conspired with the persons who committed the San Bernardino attack and with the organization that committed, planned, or authorized it.

53. Defendants are liable to Plaintiffs and the members of the Classes under 18 U.S.C. § 2333(a) and (d)(2).

**THIRD CLAIM FOR RELIEF**

**Act of International Terrorism, 18 U.S.C. § 2333(a) (against Snowden, Poitras, and Praxis)**

54. Plaintiffs repeat the foregoing allegations.

55. The theft, disclosure, and dissemination of the documents and instruction described above by Defendants Snowden, Poitras, and Praxis involved acts dangerous to human life that violated the criminal laws of the United States, including 18 U.S.C. §§ 641, 793, 798, and 2339A; appeared to be intended to intimidate or coerce a civilian population and to influence the policy of the United States government by intimidation or coercion; and transcended national boundaries.

56. Plaintiffs were injured in their persons and property by reason of those acts of international terrorism, and Defendants Snowden, Poitras, and Praxis are liable to Plaintiffs and the members of the Classes under 18 U.S.C. § 2333(a).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Classes, demand judgment against Defendants, jointly and severally on the First and Second Claims, and against Defendants Snowden, Poitras, and Praxis on the Third Claim:

(a) certifying the Classes under Fed. R. Civ. P. 23, appointing Plaintiffs as class representatives and their counsel as class counsel;

(b) awarding compensatory damages in an amount to be determined at trial, including solatium damages of not less than $8,500,000 for each of Plaintiffs Gregory and Kimberly Clayborn, and damages for each member of the Classes in amounts to be determined;

(c) awarding threefold the damages sustained, under 18 U.S.C. § 2333(a);

(d) awarding the costs of suit, including attorneys' fees, under 18 U.S.C. § 2333(a);

(e) awarding prejudgment and post-judgment interest; and

(f) granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

Dated: New York, New York
September 28, 2026

SMALLMAN LAW PLLC

By: David Brian Smallman
David Brian Smallman
43 West 43rd Street, Suite 242
New York, New York 10036
(917) 414-0182
dbs@smallmanlaw.com

*Attorneys for Plaintiffs*